**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Stephen Andrew Hodgson,**

**Plaintiff,**

**v.**

**David Crist, Warden of MCF-STW;**
**Tim Lanz, Regina Stepney,**
**Kari Jo Ferguson, and John Doe,**

**Defendants.**

**Civil No. 01-2268 (JEL/SRN)**

**REPORT AND RECOMMENDATION**

---

Stephen Andrew Hodgson, appearing Pro Se

Mark B. Levinger, Esq., on behalf of Defendants

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Plaintiff's Motion for Summary Judgment on Counts One and Three of the Complaint (Doc. No. 14) and on Defendant's Motion for Summary Judgment (Doc. No. 44). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, it is recommended that Plaintiff's motion be denied, and Defendant's motion be granted.

## I. BACKGROUND

Plaintiff is a prisoner with the Minnesota Department of Corrections serving two consecutive life sentences for first-degree murder. Plaintiff has commenced this suit against various state officials for violating his constitutional rights under 42 U.S.C. section 1983. A



DEC 2 4 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

chronological review of the facts placing this matter before the Court appears below.

In 1998 and 1999, Plaintiff's father and mother passed away. Prior to their passing, Plaintiff's parents set up a Trust (Hodgson Family Trust) in Florida. Upon Plaintiff's parents' death, Plaintiff's sister, Mary Jane Hodgson Cole, became Trustee of the Hodgson Family Living Trust. In June of 2000, Plaintiff sued Mary Jane Hodgson Cole in Scott County District Court to set aside an allegedly fraudulent conveyance of property associated with the Trust. The Scott County District Court dismissed Plaintiff's Complaint for, among other reasons, lack of jurisdiction stating that Florida courts have jurisdiction over the Trust. Hodgson v. Cole, Civ. No. 00-10606, Order & Judgment (March, 9, 2001); see also Hodgson v. Cole, C8-01-584 (Minn. App. 2001) (affirming district court).

In September of 2000, Plaintiff filed a lawsuit in federal court against a number of his siblings for libel and slander, among other things. Hodgson v. Hodgson, et al., 00-CV-2102. On October 20, 2000, Richard Huffman, attorney for Mary Jane Hodgson Cole, contacted Timothy Lanz of the Minnesota Department of Corrections and requested that Plaintiff be forbidden to contact Neal Krzyzaniak.[1] Neal Krzyzaniak was apparently involved in the purchase of some property from the Hodgson Family Trust. On October 31, 2000, the DOC issued a Direct Order that Plaintiff have no contact with Neal Krzyzaniak. In November of 2000, Plaintiff filed another lawsuit in federal court against Mary Jane Hodgson Cole, Richard Huffman, and Neal Krzyzaniak for embezzlement, racketeering, and fraud. Hodgson v. Huffman, et al., 00-CV-2483.

---

[1] Timothy Lanz thought Richard Huffman was Neal Krzyzaniak's attorney. (Lanz Aff. ¶ 3).

In April of 2001, Judge Richard H. Kyle granted defendant Huffman and Krzyzaniak's motions to dismiss. Hodgson v. Huffman, et al., 00-CV-2483, Doc. No. 23 (D. Minn. 2001). In May of 2001, Judge Richard H. Kyle granted defendant siblings' motions to dismiss. Hodgson v. Hodgson, et al, 00-CV-2102, Doc. No. 33 (D. Minn. 2001).

On or about May 21, 2001, Plaintiff brought suit in Washington County District Court against Mary Jane Hodgson Cole, Richard Huffman, and Neal Kryzaniak alleging again that the defendants had, through theft and fraud, disposed of his inheritance. In the Washington County case, Plaintiff also sought injunctive relief against the enforcement of the DOC's Direct Order that Plaintiff not have contact with Neal Kryzaniak. The district court concluded that it lacked jurisdiction over Plaintiff's claims regarding the Trust, and that it would not be in the public interest to interfere with DOC policy in this instance. Hodgson v. Cole, et al., Civ. No. 01-2858, Order (Aug. 24, 2001); see also Hodgson v. Cole, et al., C2-01-2858 (Minn. App. 2002) (affirming district court).

The present lawsuit was filed on December 10, 2001.

## II. SUMMARY JUDGMENT–STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). As to materiality, "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden to produce such evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. E.g., Vette Co. v. Aetna Casualty & Surety Co., 312 F.2d 1076, 1077 (8th Cir. 1980). Pro se pleadings are more liberally construed than those drafted by an attorney. See Smith v. St. Bernards Regional Med. Ctr., 19 F.3d 1254, 1255 (8th Cir. 1994).

## III. COUNT ONE–DENIAL OF ACCESS TO THE COURT

On October 31, 2000, the DOC issued a Direct Order (no-contact order) that Plaintiff have no-contact with Neal Krzyzaniak. Prior to the issuance of the no-contact order, Plaintiff had a subpoena duces tecum served on Neal Krzyzaniak on October 25, 2000. (Pl.'s Mem. in Support of Summ. Relief, Ex. 1). Plaintiff asserts that Neal Krzyzaniak purchased or had information about the purchase of property from the Hodgson Family Trust. Therefore, Plaintiff argues that the DOC's Direct Order that he have no contact with Neal Krzyzaniak prohibited him from "block[ing] the unlawful sale of his property, or obtain[ing] any documents required by his lawfully obtained and served subpeona." (Compl. ¶ 14).

### A. Discussion

It is well established that prisoners have a right of access to the courts embedded in the

constitution. E.g., Bounds v. Smith, 430 U.S. 817, 821 (1977); Christopher v. Harbury, 122 S.Ct. 2179, 2186 n.12 (2002) (noting that the right may be grounded in a variety of provisions of the constitution). There are two types of denial of access to the courts cases. Harbury, 122 S.Ct. at 2185. The first type includes those that are forward looking where "official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." Id. A typical example of this category would be prison law library litigation where a prison's law library is so inadequate that it prevents a prisoner from bringing a claim, for example, attacking his/her conviction. The second type includes backward looking cases where official action has "caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." Id. at 2186.

With both categories of denial of access to the court cases, it is clear that a Plaintiff must, as a constitutional prerequisite, show actual injury. Lewis v. Casey, 518 U.S. 343, 349 (1996). The actual injury requirement, in addition to being a constitutional prerequisite, is a recognition that the right to access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Harbury, 122 S.Ct. at 2186-87. Therefore, an additional requirement a plaintiff asserting a denial of access to the courts claim must meet is that:

> [T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as the allegations must describe the official acts frustrating the litigation. It follows, too, that when the access claim . . . looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought.

Id. at 2187.

Moreover, the underlying or predicate claim to the access claim must be stated in the complaint asserting the access claim in accordance with Federal Rule of Civil Procedure 8(a) so that the parties and the court can determine if the underlying claim is frivolous. Id. at 2187-88.

Finally, the decision by the United States Supreme Court in Casey has tightened further the requirements for a prisoner to bring a denial of access to the courts claim. As the Court observed "the injury requirement is not satisfied by just any type of frustrated legal claim." Casey, 518 U.S. at 354. Rather, prisoners only have a right of access "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Id. at 355.

For a variety of reasons, Plaintiff's denial of access to the courts claim fails as a matter of law.[2]

First, Plaintiff has failed to adequately plead the underlying claim. See generally Harbury, 122 S.Ct. at 2187. Plaintiff's access claim appears to be a backward looking claim. In his Complaint, Plaintiff simply argues that the DOC no-contact order prevented him from

---

[2] Given this Court's recommendation, this Court feels compelled to address a matter heavily relied on by Plaintiff. In the Washington County case, Judge Kenneth Maas dismissed Plaintiff's complaint solely on the basis that Minnesota courts lack jurisdiction over the Hodgson Family Trust and its property. Hodgson v. Cole, et al., Civ. No. 01-2858, Order (Aug. 24, 2001). Judge Maas also denied a temporary injunction against the Neal Krzyzaniak no-contact order on the basis that it had been totally rescinded and that it would not be in the public interest to invade DOC disciplinary tools. Id. In *dicta*, Judge Maas noted that "this Court would once again like to point out the troubling nature of the Direct Order from the Department of Corrections against Plaintiff that denied him the ability to access the courts for legal redress of his claims." Id. This statement is not dispositive for purposes of this motion. Judge Maas obviously was not analyzing a denial of access claim under applicable law in his order. His comment was directed generally to the practice of the DOC and was made in *dicta* only.

stopping the unlawful sale of certain property. In his summary judgment papers, Plaintiff references the Scott County litigation and the Washington County litigation and that he lost those cases because of the DOC no-contact order. Thus, Plaintiff appears to be asserting that the underlying claim is that from the Washington County case or the Scott County case (or both). However, a similar claim to that in the Washington County and Scott County cases was made in this Court, at a similar time, before Judge Richard H. Kyle. In any event, this Court must guess as to Plaintiff's underlying claim. Pleading the underlying claim is important because it allows a court to determine whether the underlying claim is frivolous. E.g., Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001) (affirming dismissal of an access claim because the plaintiff did not demonstrate that his underlying claims were nonfrivolous). This, in turn, is important because "[d]epriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."[3] Casey, 518 U.S. at 353 n.3. Accordingly, Plaintiff's claim must fail. See id. ("[T]he underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as the allegations must describe the official acts frustrating the litigation.").

Second, and most glaringly, Plaintiff has failed to assert a remedy that *this Court can provide* and *that is not otherwise available* in a properly pleaded suit on the underlying claim. See id., ("[T]he complaint must identify a remedy that may be awarded as recompense but not

---

[3] Regarding the merits in the Scott County case, Judge Rex D. Stacey stated: "Should Plaintiff persist in filing additional matters in Scott County, however, such [Rule 11] sanctions will be appropriate and will be imposed. . . . If he's being wronged (*and this Court sees absolutely no credible evidence tending to show that he is*) he can petition the Florida courts for relief." Hodgson v. Cole, Civ. No. 00-10606, Order (1st Judicial Dist. March 9, 2001) (emphasis added).

otherwise available in some suit that may yet be brought."). Assuming the underlying remedy Plaintiff seeks is to set aside the allegedly fraudulent conveyance and/or alleged misappropriation of his property in the Washington County and/or Scott County cases, this Court can not grant such a remedy. As the Minnesota Court of Appeals has held on two occasions, the property Plaintiff complains of is or was a part of the Hodgson Family Trust and subject to the jurisdiction of the Florida courts. See Hodgson v. Cole, No. C7-01-1743, 2002 WL 554349, *1 (Minn. App. Apr. 16, 2002); Hodgson v. Cole, C8-01-584 (Minn. App. Sept. 28, 2001). Therefore, this Court can not provide a remedy in regard to such property. Moreover, Plaintiff has *always* been able to seek a remedy on the underlying claim in the Florida courts. In fact, on January 23, 2001, Plaintiff petitioned the Circuit Court for Pinellas County, Florida to void the sale of certain trust property located in Florida. (Ferguson Aff. Ex. I).

The undisputed facts show that Plaintiff is not subject to a no-contact order that would in anyway prevent him from bringing an appropriate suit in Florida. For the sake of clarity and Plaintiff's understanding, this Court will explain the issue of all the no-contact orders. In 1994, Plaintiff received a no-contact order with respect to members of the jury that convicted him of first degree murder after he attempted to contact jury members regarding his trial. (Rudeen Aff., Ex. E). This no-contact order has no bearing on Plaintiff's ability to bring a claim regarding trust property in Florida. On November 19, 1999 and December 3, 1999, Plaintiff received no-contact orders with respect to two of his siblings, Martha Lee and Patrick Hodgson–both parties requested the orders. (Rudeen Aff. at ¶ 8). These orders were modified on March 23, 2000 to specifically allow Plaintiff to send legal materials. (Rudeen Aff. Ex. H). Therefore, this no-contact order would not prevent Plaintiff from bringing a claim regarding trust property in

Florida. On March 28, 2000, Plaintiff received a no-contact order with respect to another sibling, Christine Hodgson. Christine Hodgson requested the order because she "consider[s] him to be a dangerous person to my family and myself." (Rudeen Aff. Ex. I).[4] This order was modified on April, 5, 2000 to specifically allow Plaintiff to send legal materials. (Rudeen Aff. Ex. J). Therefore, this no-contact order would not prevent Plaintiff from bringing a claim regarding trust property in Florida. Plaintiff has never been disciplined with regard to any of these no-contact orders, even after serving legal papers on persons named in the no-contact orders. (Rudeen Aff. at ¶ 10). On October 31, 2000, Plaintiff received a no-contact order with respect to Neal Krzyzaniak. (Lanz Aff. Ex. B). The Krzyzaniak no-contact order was totally rescinded on July 23, 2001. (Ferguson Aff. Ex. F.). Therefore, this no-contact order would not prevent Plaintiff from bringing a claim regarding trust property in Florida. In sum, the no-contact orders that have been issued against Plaintiff would not prevent Plaintiff in anyway from instituting a lawsuit based on the claim underlying his denial of access to the courts claim in the appropriate court in Florida. Accordingly, "*[t]here is . . . no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element*." Harbury, 122 S.Ct. at 2187 (emphasis added).

Third, Plaintiff has failed to provide evidence of actual injury. See generally Casey, 518 U.S. at 349. Plaintiff argues that he was prevented from obtaining documents from Neal Krzyzaniak by the October 31, 2000 no-contact order. Plaintiff asserts that if he would have

[4] This exhibit is part of the Rudeen affidavit but appears to be erroneously marked as a Ferguson exhibit.

gotten the documents he requested prior to the dismissal of the Scott and Washington County cases, he could have introduced one document that would have shown that the Defendants in those cases were lying. As this Court understands Plaintiff's argument and elaborates on it for him here, an Affidavit of Trustee[5] made by Mary J. Cole on May 3, 2001 states that the Hodgson Family Trust "is not supervised by any Court." (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 6(A)). Plaintiff argues that this document would have shown that the Scott and Washington County courts wrongly dismissed his case. Plaintiff, however, has produced no evidence that such document would have changed the Minnesota courts' rulings on whether they have jurisdiction over the trust and/or the property held in the trust.

In addition, the undisputed facts surrounding the Neal Krzyzaniak no-contact order demonstrate that Plaintiff was not prevented from contacting Neal Krzyzaniak with respect to legal matters, and, therefore, the no contact order had no effect on Plaintiff's ability to obtain documents. On October 9, 2000, Plaintiff sent Neal Krzyzaniak a letter informing him that Plaintiff was getting a subpoena and that Neal Krzyzaniak's company would be named in a yet to be filed lawsuit.[6] On October 25, 2000, Plaintiff actually sent Neal Krzyzaniak a subpoena duces tecum. On October 31, 2000, Plaintiff was issued a no-contact order with respect to Neal Krzyzaniak. Then, on November 8, 2000, Plaintiff filed a lawsuit in federal court naming Neal Krzyzaniak as a defendant, obviously Plaintiff must have contacted Mr. Krzyzaniak. On or about May 21, 2001, Plaintiff filed a lawsuit in Washington County court again naming Neal

---

[5] This affidavit is required by Minn. Stat. § 501B.57 prior to the sale of real estate held in trust.

[6] This letter itself could at least arguably be considered harassing.

Krzyzaniak a defendant. From January 2001 to July 2001, Plaintiff sent nine items of legal correspondence to the attorney representing Neal Krzyzaniak in the Washington County case, Richard Hocking. (Rudeen Aff., Ex. C.). On June 7, 2001, Plaintiff explained in a DOC offender kite form that the Neal Krzyzaniak no-contact order had been "modified to exclude legal service." (Rudeen Aff., Ex. B). Moreover, Neal Krzyzaniak answered interrogatories Plaintiff sent to him on July 3, 2001. (Ferguson Aff., Ex. E). Therefore, it is undisputed that Plaintiff was free to and repeatedly did contact Neal Krzyzaniak regarding legal matters during the time the no-contact order with respect to Neal Krzyzaniak was in effect. Moreover, once Plaintiff actually sued Neal Krzyzaniak in the Washington County case and the federal case, both during the existence of the no-contact order, Plaintiff could have simply requested any documents through discovery, rather than subpoena, and Plaintiff did use the discovery process when he sent interrogatories to Neal Krzyzaniak. In sum, Plaintiff has simply failed to produce evidence demonstrating that the Neal Krzyzaniak no-contact order caused him any injury in the underlying or predicate claim to his denial of access claim. Accordingly, Plaintiff's claim must fail as a matter of law. See generally Casey, 518 U.S. at 349. For an example of other no-contact orders that have been upheld where the orders were applied to individuals that the prisoner was suing, see Berdella v. Delo, 972 F.2d 204, 209-10 (8th Cir. 1992); Bergmann v. McCaughtry, 48 F.3d 1221 (7th Cir. 1995) (table), available at 1993 U.S. Dist. LEXIS 20767, *8-9.

Fourth, Plaintiff may not have a constitutional right of access to the courts to assert his underlying claim. As Lewis v. Casey, 518 U.S. 343 (1996) made clear, prisoners only have a right of access "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the

incidental (and perfectly constitutional) consequences of conviction and incarceration." 518 U.S. at 355. Casey, however, involved forward looking prison law library litigation, and the Court seemed to be stating that prisons only need to provide prisoners the tools to bring three limited types of cases: (1) appeals attacking conviction or sentencing; (2) habeas petitions; and (3) civil rights cases. It is not entirely clear that this rule applies in backward looking cases where official action somehow infringed on a trust or property case that a prisoner has already filed. If the rule from Casey does apply, Plaintiff's claim would clearly fail as a matter of law because Plaintiff would have no constitutional right of access as the *underlying claim* is not attacking his conviction, is not a habeas petition, and is not a § 1983 civil rights claim.

Since Plaintiff can not maintain a denial of access to the courts claim as a matter of law, this Court need not address whether Defendant's are entitled to immunity in their official and individual capacity.

## IV. COUNT TWO–DENIAL OF FREE SPEECH

Plaintiff alleges that the Neal Krzyzaniak no-contact order violated his right to free speech and association under the First Amendment. In deciding whether summary judgment is appropriate, it is important to consider the relief Plaintiff requests for this Count. Plaintiff requests compensatory damages.[7] (Compl., at 7 ¶ 21, at 16 ¶ 4).

### A. **Discussion**

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987). It is well settled, however, that

---

[7] Plaintiff also requests a declaratory judgment that no-contact orders, in general, issued by the DOC violate the First Amendment but that will be addressed in discussion of Count Four.

prisoners do not enjoy the same constitutional protections as free citizens. E.g., Pell v. Procunier, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[8] Turner, 482 U.S. at 89.

In the context of a prisoner's First Amendment right to send outgoing correspondence, a restriction on that right impinges on the First Amendment rights of "those who have a particularized interest in communicating with" the prisoner. Procunier v. Martinez, 416 U.S. 396, 408 (1974). In Martinez, the Court considered the standard of review for restrictions on correspondence between prisoners and members of the general public. Id. at 407-14. Where the prison policy affects outgoing correspondence, the Court stated that it "must further an important or substantial government interest unrelated to the suppression of expression" and it "must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Id. at 413. The Martinez Court, however, did not decide the case in relation to a prisoner's First Amendment right to send correspondence to the general public. Rather, "[t]he *Martinez* Court based its ruling striking down the content-based regulation on the First Amendment rights of those who are not prisoners, stating that '[w]hatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest

[8] Defendants, without any discussion of Procunier v. Martinez, 416 U.S. 396 (1974) or Thornburgh v. Abbott, 490 U.S. 401 (1989), assume that this Turner standard applies to the DOC's regulations.

is grounded in the First Amendment's guarantee of freedom of speech.'" Turner, 482 U.S. at 85 (quoting Martinez, 416 U.S. at 408). Accordingly, the Martinez standard applies to outgoing correspondence "between inmates and those who have a particularized interest in communicating with them." Martinez, 416 U.S. at 408; see also e.g., Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (overruling Martinez's application to incoming correspondence); Bell-Bey v. Williams, 87 F.3d 832, 838 n.7 (6th Cir. 1996) (noting that Martinez applies only to outgoing correspondence). On the other hand, the Turner standard applies to all other types of correspondence.

Importantly, where a private citizen indicates that they do not want to have contact with a prisoner, it would appear that the private citizen's First Amendment rights recognized in Martinez are not infringed. Bergmann v. McCaughtry, 48 F3d 1221, 1993 U.S. Dist. LEXIS 20767, *8 (7th Cir. 1995) (table) ("Implicit in the holding in *Procunier* is the negative holding that no First Amendment right is at stake when a prisoner wants to write to an addressee who has indicated an affirmative desire not to receive his letters.") cert. denied, 516 U.S. 846 (1995). Accordingly, the Tenth Circuit has applied the more deferential Turner standard to prison regulations that limit a prisoner's right to contact private citizens by phone when the private citizen has indicated that they do not wish to be contacted. Young-Bey v. Swanson, 3 Fed.Appx. 929, 2001 WL 179798, at *2 (10th Cir. Feb. 23, 2001). The Eighth Circuit, however, has held that even though a private citizen has indicated that they do not want to be contacted by a prisoner–and therefore only the prisoner's rights were being affected–the higher Martinez standard of review still applies. Berdella v. Delo, 972 F.2d 204, 209 n.8 (8th Cir. 1992). In so holding, the Eighth Circuit explained that Thornburgh overruled Martinez's application to

incoming mail because of the heightened security risk of incoming mail, "not because only the inmate's rights were affected by the restrictions." Id. The Eighth Circuit found no heightened security risk with outgoing mail to unwilling recipients and therefore applied the Martinez standard. Id. Accordingly, this Court will apply the Martinez standard to the Neal Krzyzaniak no-contact order issued to Plaintiff.

It now appears to be undisputed that Neal Krzyzaniak never requested that Plaintiff not contact him. (Ferguson Aff. Ex. E); (Lanz Aff.). Rather, what did occur is as follows. On October 20, 2002, Richard Huffman, attorney for Mary Jane Hodgson Cole, called the DOC and requested that Plaintiff no longer contact Neal Krzyzaniak. (Lanz Aff. ¶ 3). Timothy Lanz, Assistant to the Warden, took Mr. Huffman's call and was under the impression that Mr. Huffman was Neal Krzyzaniak's attorney. Id. Mr. Huffman also sent a fax to Timothy Lanz containing a letter Plaintiff had sent to Neal Krzyzaniak wherein Plaintiff informed Neal Krzyzaniak that Plaintiff would be getting a subpoena and would be suing Neal Krzyzaniak in the future. Id. Based on Mr. Huffman's request and the fax, a no-contact order with respect to Neal Krzyzaniak was issued to Plaintiff. Id. at ¶ 4.

As discussed infra Part VII, the DOC's policy/regulation providing for the issuance of no-contact orders to prisoners when individuals request that a prisoner not contact them is perfectly constitutional under the Martinez standard. Berdella v. Delo, 972 F.2d 204, 209 (8th Cir. 1992) (upholding a nearly identical prison no-contact order policy); see also Young-Bey v. Swanson, 3 Fed.Appx. 929, 2001 WL 179798, at *2 (10th Cir. Feb. 23, 2001) (upholding a no-contact/no-call order on a prisoner); Bergmann v. McCaughtry, 48 F.3d 1221, 1993 U.S. Dist. LEXIS 20767, at *7-8 (7th Cir. 1995) (table) (upholding no-contact order). No-contact orders are

reasonably related to the legitimate penological interest of prevent harassment and security to the public. See, e.g., Young-Bey, 2001 WL 179798, at *2 ("We agree with the Eleventh Circuit that '[r]eduction of criminal activity and harassment qualifies as a legitimate governmental objective.'"). In addition, under the Martinez standard, the prevention of harassment is a substantial governmental interest justifying a no-contact order. Berdella, 972 F.2d at 209 ("[T]he government's interest in protecting the public from harassment by inmates would justify prohibiting an inmate from sending mail to persons who have affirmatively requested that mail not be received from an inmate."); Bergmann, 1993 U.S. Dist. LEXIS 20767, at *8 ("[D]efendants have shown that their action furthered a substantial governmental interest in preventing the public from threats and harassment from prison inmates.").

With regard to the Neal Krzyzaniak no-contact order, the only issue is that the order was technically not issued after Neal Krzyzaniak requested the order. Rather, the DOC issued the order after it got a call from Richard Huffman, who was thought to be Neal Krzyzaniak's attorney, stating that Neal Krzyzaniak did not want any contact from Plaintiff. This makes the Neal Krzyzaniak no-contact order similar to the one in Finney v. Bd. of Corrections, 505 F.2d 194 (8th Cir. 1974), where the Eighth Circuit invalidated a prison regulation that prohibited all prisoner communication with persons outside the prison unless the person outside the prison affirmatively consented to the communications.[9]

Even so, Defendants are entitled to qualified immunity from any damages. "Generally,

---

[9] This is not to say that Neal Krzyzaniak had a particularized interest in communicating with Plaintiff. Indeed, Neal Krzyzaniak stated in answering Plaintiff's interrogatories that, depending on one's definition of "harassment," Plaintiff's act of filing two lawsuits against Krzyzaniak might be considered harassment. (Ferguson Aff. Ex. E).

prison officials may rely on a claim of qualified immunity to shield themselves from liability." Tyler v. Barton, 901 F.2d 689, 690 (8th Cir. 1990). Qualified immunity is *unavailable* only where: "(1) the officials' conduct violates a clearly established statutory or constitutional right; (2) the officials knew or should have known the right was clearly established; and (3) the officials knew or should have known their conduct violated that right." Id. at 690-91.

Here Defendants thought that they had received a request for a no-contact order from Neal Krzyzaniak's attorney, an agent who would be entitled to act on a private citizen's behalf. Hence, Defendants thought that they were enforcing a policy that is clearly constitutional. That belief was objectively reasonable and certainly did not rise to the level of so plainly incompetent as to constitute a knowing violation of a clearly established right. See Tyler, 901 F.2d at 690-91; Malley v. Briggs, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). Accordingly, Defendants are entitled to qualified immunity and Plaintiff's Count II should fail as a matter of law.

**V. COUNT THREE–DENIAL OF DUE PROCESS**

Plaintiff alleges that he received a Direct Order not to have any contact with Neal Krzyzaniak without being afforded the opportunity for a hearing and access to complaints made against him. In deciding whether summary judgment is appropriate, it is important to consider the relief Plaintiff requests for this Count. Plaintiff requests compensatory damages. (Compl., at 10 ¶ 37, at 16 ¶ 4). Plaintiff also requests broad injunctive relief such that the DOC can not issue "'no-contact' written direct orders to any person, or to enforce such orders, without providing a meaningful hearing in which the person subject to that order has full and complete access to the

evidence being used against him, and has a meaningful opportunity to challenge that evidence." (Compl., at 16 ¶ 3(B)).

### A. Discussion

It is true that "prisoners do not shed all constitutional rights at the prison gate, but '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Sandin v. Conner, 515 U.S. 472, 485 (1995) (citations omitted). Likewise, "the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). A prisoner may be entitled to due process where a condition of his confinement is changed if the prisoner can show the government deprived him of a liberty interest. Sandin, at 477-85. Liberty interests in the prison context are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes *atypical* and *significant hardship* on the inmate in relation to the ordinary incidents of prison life." Id. at 483-84 (emphasis added) (citations omitted). Therefore, not every "state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause," just those that represent an atypical and significant hardship in comparison to normal prison life. Id. at 484.

This Court need not decide if the taking away of a prisoner's right to contact a private citizen is an atypical and significant hardship compared to the normal incidents of prison life because, in this situation, Plaintiff was given all the procedural due process that was required.

See generally Procunier v. Martinez, 416 U.S. 396, 417-19 (1974) overruled in part on other grounds by Thornburgh v. Abbott, 490 U.S. 401 (1989).

Here, Plaintiff was notified in writing by Regina Stepney of the DOC's decision that he would not be allowed to contact Neal Krzyzaniak. (Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 5); (Lanz Aff., Ex. B). See Martinez, 416 U.S. at 418 (noting that the inmate should be notified).

Second, Plaintiff was given a reasonable opportunity to protest the decision to issue the no-contact order. See Martinez, 416 U.S. at 418 (noting that the inmate should be given a reasonable opportunity to protest the decision). Minnesota Department of Corrections Policy 303.100 provides for offender/staff communication and the filing of grievances. (Crist Aff., Ex. A). Under the policy 303.100, inmates can file a grievance with the DOC by submitting a written grievance to the staff member who is responsible for the issue. Id. If the issue is not resolved, the inmate can essentially submit a grievance to the superiors of staff members up the chain of command. Id. The policy provides that staff will respond within five working days; however, it notes that in certain situations response time will be greater and "staff will respond within the shortest time possible." Id. In addition, there are other methods to discuss issues with prison staff such as offender representative groups and "kites," which are internal written communications. Id. Nothing prevented Plaintiff from protesting the DOC's decision via the grievance procedure. In fact, Plaintiff did protest the issuance of the Neal Krzyzaniak no-contact order. Although Plaintiff provides no documentation of a formal protest of the issuance of the no-contact order, Plaintiff does state in his Complaint that during May of 2001 and June of 2001 he made requests to Defendants Stepney, Lanz, and Crist that the Neal Krzyzaniak no-contact order be lifted. (Compl. ¶ 28, 29); Defendants have produced such documents.

Finally, Plaintiff's protests or grievances were referred to a prison staff official other than Regina Stephey. See Martinez, 416 U.S. at 418-19 (noting that the complaints should be referred to a prison official "other than the person who originally disapproved the correspondence" or contact). Plaintiff's grievance ("kite") filed June 7, 2001 to Defendant Lanz was referred to Lisa Rudeen. (Lanz Aff. ¶ 5). Lisa Rudeen then referred the June 7, 2001 grievance to Regina Stephey. (Rudeen Aff. ¶ 2). Regina Stephey then reviewed Plaintiff's June 7, 2001 grievance. (Stephey Aff. ¶ 2). Stephey learned that Plaintiff had filed papers with the Attorney General's Office regarding the no-contact order. Id. It is the Minnesota DOC's policy to defer to the Attorney General's Office, being the ultimate authority, when a prisoner has involved that office. Accordingly, Stephey did not respond to Plaintiff's substantive requests. Id.; see also (Stephey Aff., Ex. A). Plaintiff filed another grievance ("kite") with Warden Crist on June 25, 2001. (Rudeen Aff. ¶ 3); see also (Rudeen Aff., Ex. A). In the June 25, 2001 grievance, Plaintiff indicated that he had involved the Attorney General's Office; accordingly, Rudeen and Crist did not respond to Plaintiff's request and deferred to the Attorney General's Office. Id. On June 26 and July 10 of 2001, the Attorney General's Office received requests and pleadings in the Washington County case seeking to join Defendants herein as parties. (Ferguson Aff. ¶ 2, 4). Sometime between July 10, 2001 and July 17, 2001, Assistant Attorney General Kari Jo Ferguson spoke with the Minnesota DOC and told them that the Neal Krzyzaniak no-contact order should be rescinded. Id. at ¶ 5. On July 17, 2001, Assistant Attorney General Ferguson talked with Plaintiff via telephone and explained that the Neal Krzyzaniak no-contact order would be rescinded. Id. at ¶ 6; see also (Ferguson Aff., Ex. C). On July 18, 2001, Assistant Attorney General Ferguson sent Plaintiff a letter confirming that the no-contact order would be

rescinded and removed from Plaintiff's file. (Ferguson Aff., Ex. C). On July 23, 2001, the Neal Krzyzaniak no-contact order was totally rescinded. (Ferguson Aff., Ex. F).

Hence, not only did Plaintiff receive all the process that he was due, Plaintiff was in fact successful in his requests. Since Plaintiff was given all the procedural due process to which he was entitled, Plaintiff has not suffered any due process injury. Accordingly, Plaintiff does not have standing to request that the DOC be permanently enjoined from issuing no-contact Direct Orders without providing a hearing where the prisoner is given full access to all information and grievances. Moreover, it is an arguable question whether Plaintiff, under these facts, is, as a matter of law, entitled to any procedural due process much less the type of due process Plaintiff requests. Compare Sandin v. Conner, 515 U.S. 472, 483-84 (1995) (limiting the necessity of due process in the prison context to those conditions that present an atypical and significant hardship), with Procunier v. Martinez, 416 U.S. 396, 417-19 (1974) (holding, in a pre-Sandin case, that when outgoing prisoner correspondence is limited very minimal due process protections must be afforded), and Looker v. State of Ohio, 168 F.3d 490 (6th Cir. 1998) (holding, in a post-Sandin case, that the application of a prison regulation limiting a prisoner's right to free exercise did not require any procedural due process because it did not represent an atypical and significant hardship). In addition, this Court is aware of the oft-noted principle that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." Sandin, 515 U.S. at 482.

Finally, Plaintiff argues that he was denied access to any complaints made against him in connection with the no-contact order and the due process he received. This issue is now moot given the rescission of the no-contact order. However, Plaintiff should be aware that he is not

entitled to have access to such grievances. See Lewis v. Casey, 518 U.S. 343, 354 (1996) (announcing in plain terms that a State need not "enable the prisoner to *discover* grievances").

## VI. COUNT FOUR–RETALIATION

Plaintiff alleges that in response to his seeking information about the Neal Krzyzaniak no-contact order, DOC staff retaliated against him in regard to his prison work assignments and pay and other no contact orders.

### A. Discussion

"Prison officials may not retaliate against an inmate for filing legal actions in the exercise of his constitutional right of access to the courts." Goff v. Burton, 7 F.3d 734, 736 (8th Cir. 1993). "Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." Thus, motive and intent are of central importance. See Madewell v. Roberts, 909 F.2d 1203, 1207 (8th Cir. 1990). A plaintiff must demonstrate that the prison would not have taken the action in question but for the impermissible motive. E.g., Foster v. Delo, 130 F.3d 307, 308 (8th Cir. 1997) (per curiam) (noting that plaintiff "did not produce evidence that his request for a new stereo and television would not have been denied but for the motive of retaliation for his filing numerous lawsuits against prison officials") (citing Goff, 7 F.3d at 737).

The undisputed facts concerning Plaintiff's retaliation claim are as follows. On July 1, 2001, the DOC increased its literacy expectation from a tenth grade reading level to a GED or high school diploma. (Meineke Aff. ¶ 3). Starting in October of 2001, inmates without a verified GED or highschool diploma on file were to be ineligible for pay raises on their work assignments unless they were attending at least two hours per week of literacy classes. Id.

Accordingly, many inmates were required to verify their literacy status if they wanted pay raises. On August 13, 2001, Plaintiff's work supervisor received a memorandum from Pat Meineke, Education Supervisor for the prison, stating that Plaintiff was not eligible for pay raises because he did not have a verified GED or highschool diploma on file. (McElwain Aff. ¶ 3). Sometime thereafter, Plaintiff told DOC education staff that he received his GED while incarcerated at MCF-St. Cloud in the late 1970s. (Meineke Aff. ¶ 4). DOC staff attempted to verify Plaintiff's GED status at MCF-St. Cloud, but the information relayed by Plaintiff proved to be erroneous. Id. Meanwhile, Plaintiff apparently received a copy of his GED from the Minnesota Department of Children, Families, and Learning on October 12, 2001, and gave a copy thereof to Mel McElwain, his work supervisor. (McElwain Aff. ¶ 5). Plaintiff apparently told Mr. McElwain that he sent a copy of his GED to the DOC education staff. Id. On December 20, 2001, the DOC verified through the Minnesota Department of Children, Families, and Learning that Plaintiff received his GED in 1977 from the Lehman Center in St. Paul, as opposed to MCF-St. Cloud. (Meineke Aff. ¶ 4). Ms. Meineke states that none of Plaintiff's educational records were destroyed or altered and no one in the Education department had any motive to retaliate against Plaintiff. (Meineke Aff. ¶ 2, 5). On January 2, 2002, Mr. McElwain received a memorandum stating that Plaintiff was eligible for pay increases because the DOC had verified Plaintiff's GED status. (McElwain Aff. ¶ 6).

In July of 2001, Plaintiff received a pay increase from $1.00 to $1.25 per hour. (Thoreson Aff. ¶ a-b). In October of 2001, Plaintiff received the next regularly scheduled pay increase to $1.50 per hour. Id. at ¶ c. Sean Thoresen, Senior Account Clerk for Inmate Payroll at the DOC, stated that Plaintiff received this pay increase even though he was technically

ineligible because his GED status had not yet been verified. Id. In January of 2002, Plaintiff did not receive a pay increase because in Plaintiff's job classification there were already 4 out of 27 persons at the $1.75 per hour slot. Id. at ¶ d. This meant that Plaintiff had to wait until a $1.75 per hour slot opened. Id. In April of 2002, a slot opened and Plaintiff received a pay raise to $1.75 per hour. Id. Finally, in July of 2002, Plaintiff received another pay raise to $2.00 per hour. Id. at ¶ e. $2.00 per hour is the most that Plaintiff can earn for the work he does, and Plaintiff has continued at this rate of pay since July of 2002. Id.

The above facts show that Plaintiff received every pay raise that he could possibly earn. Therefore, Plaintiff can not complain that he suffered any negative consequence from the DOC's literacy policy, or that he was treated differently than other prisoners. Quite simply, there was nothing retaliatory in effect or intent about the literacy policy that was applied to all inmates without a verified GED or high school diploma. Moreover, Plaintiff has produced no evidence that he would not have had to verify his GED status but for the motive of retaliation in response to Plaintiff's legal actions. See Foster v. Delo, 130 F.3d 307, 308 (8th Cir. 1997) (per curiam) (requiring proof on a retaliation claim that the prison officials would not have acted but for a retaliatory motive).

Plaintiff also baldly asserts in his Complaint that he was subject to threats and intimidation. Then, Plaintiff produced two affidavits in connection with his reply memorandum from fellow inmates stating that they saw Defendants whispering while looking at Plaintiff, and that Plaintiff's "cell was being searched far more frequently than normal security procedures required." (Beck Aff. ¶ 4); see also (Johnson Aff.) (a second supplemental affidavit explaining, not Plaintiff's, but this affiant's complaints about prison staff). The assertions in the affidavits

about searching Plaintiff's cell are not contained anywhere in Plaintiff's own Complaint, and Plaintiff has not made an argument in any of his briefs that his cell was irregularly searched. Thus, this evidence is beyond the allegations in Plaintiff's Complaint and can not form a basis for Plaintiff's retaliation claim. See Conway v. Goins, 2002 WL 31236398, *1 (8th Cir. Oct. 7, 2002) (per curiam). Even considering the two affidavits from fellow inmates and cognizant of the fact that pro se pleadings are held to a more liberal standard, Plaintiff has still not brought forth such evidence as to avoid summary judgment. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The fact that Plaintiff has never, himself, alleged that his cell was irregularly searched and that the affidavits of two inmates only assert in very general terms that Plaintiff's cell was irregularly searched represents a mere scintilla of evidence such that a jury could not reasonably find for Plaintiff. See generally Sanders v. St. Louis County, 724 F.2d 665, 668 (8th Cir. 1983) (explaining that comments from two county employees represented a mere scintilla of evidence in support of a prisoner's claim that there was a policy or custom of mistreating writ writers). Moreover, Plaintiff has not produced evidence, because he has never made the allegation, that his cell would not have been searched as it was "but for the motive of retaliation for his filing numerous lawsuits against prison officials." Foster v. Delo, 130 F.3d 307, 308 (8th Cir. 1997) (per curiam). Finally, mere whispering or bad looks do not represent actionable conduct. Cf. Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir. 1985) ("Verbal threats are not constitutional violations cognizable under § 1983.").

Finally, Plaintiff alleges that the no-contact orders issued with respect to his siblings have

continued in place as a means of retaliation. Plaintiff presents absolutely no evidence supporting this claim. Rather, the evidence presented indicates that Defendant's siblings requested the no-contact orders, and that the DOC has simply maintained such orders at Defendant's siblings' request. (Rudeen Aff. ¶ 8, Ex. I); (Dorsey Aff. ¶ 3).

Therefore, Plaintiff's Count Four should fail.

## VII. COUNT FIVE–FREE SPEECH, DENIAL OF ACCESS TO THE COURTS, and DUE PROCESS

Plaintiff alleges that the November 19, 1999 and December 3, 1999 no-contact orders he received with respect to two of his siblings, Martha Lee and Patrick Hodgson, violate his First Amendment right to free speech, deny him access to the courts, and were issued without providing due process. Plaintiff requests compensatory damages and a declaratory judgment that the DOC's no-contact orders violate the First Amendment.

### A. Discussion: First Amendment

As noted supra Part IV, the standard of review from Procunier v. Martinez, 416 U.S. 396, 413 (1974) applies to the no-contact orders issued by Defendants. Where the prison policy affects outgoing correspondence, it "must further an important or substantial government interest unrelated to the suppression of expression" and it "must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Id.

In Berdella v. Delo, 972 F.2d 204, 209 (8th Cir. 1992), the Eighth Circuit upheld a nearly identical prison regulation that allowed for the issuance of no-contact orders to prisoners upon a private citizen's request. In applying the Martinez test, the Eighth Circuit held: "The Department's policy is generally necessary to serve the government's legitimate interest in

protecting the public from harassment. Summary judgment in favor of Delo and Branson [the prison officials] as to this aspect of Berdella's First Amendment claim, therefore, is proper." Id. This holding is in accord with the Seventh Circuit's finding that protecting the public from harassment is a substantial governmental interest, and that a no-contact order is not greater than necessary to further that interest. Bergmann v. McCaughtry, 48 F3d 1221, 1993 U.S. Dist. LEXIS 20767, *8 (7th Cir. 1995) (table) (adopting district court opinion holding that "defendants have shown that their action furthered a substantial governmental interest in preventing the public from threats and harassment from prison inmates. This is a valid interest of penal administration.").

Defendant's regulation/policy[10] furthers the same substantial interests of preventing threats and harassment. Martha Lee and Patrick Hodgson requested the no-contact orders in question. (Rudeen Aff. ¶ 8); (Dorsey Aff. ¶ 3). Warden David Crist explained that the primary purpose of the DOC's regulation is to prevent harassment and threats and maintain public safety. (Crist Aff. ¶ 3-4). Warden Crist explained that inmates can contact private citizens in a variety of ways and that such contact can, quite obviously, be threatening and harassing. Id. Moreover, the no-contact regulations have been applied so as to not prevent communications concerning legal matters, and are thus no greater than necessary. See also Bergmann, 48 F3d 1221, 1993

---

[10]DOC Policy No. 302.020, Subsection K(3) states:

> Offenders may not send mail in violation of a direct order issued on the written request of a person or parent/guardian of a minor or legally incompetent person stating that he/she does not want to receive mail from the offender. Offenders may not enclose letters to a restricted person in an envelope addressed to another person.

U.S. Dist. LEXIS 20767, at *8. Therefore, Defendants' policy of issuing no-contact orders is constitutional. This aspect of Plaintiff's Count Five should fail as a matter of law.

### B. <u>Discussion: Denial of Access</u>

As discussed <u>supra</u> Part III, a denial of access to the courts claim requires: (1) the underlying claim to be pleaded with the denial of access claim; (2) Plaintiff must show that the underlying claim is not frivolous; (3) the Plaintiff must show he/she suffered an actual injury; (4) in a backward looking claim, the Plaintiff must show that the court where the access claim is brought can provide a remedy for the underlying claim; and (5) the remedy must not be available in an otherwise appropriate suit on the underlying claim.

Plaintiff's claim that the no-contact orders issued with respect to Martha Lee and Patrick Hodgson have denied him access to the courts fails every requirement established for an access claim.

Plaintiff has neither pleaded the underlying claim nor shown that the underlying claim has any merit. In his Complaint, Plaintiff alleges that the no-contact orders are preventing him from serving papers in "a Florida matter." (Compl. ¶ 54). This allegation hardly complies with Federal Rule of Civil Procedure 8(a) such that this Court can determine if the underlying claim is frivolous. This, of course, is necessary because "[d]epriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions." <u>Lewis v. Casey</u>, 518 U.S. 343, 353 n.3 (1996).

Plaintiff has not shown that he has suffered any injury. Without knowing what the underlying claim is, it is quite difficult to determine if the no-contact orders had any effect on the claim. In any event, Plaintiff can not argue that the no-contact orders with respect to Martha Lee

and Patrick Hodgson have prevented him from bringing, prosecuting, or defending any lawsuit because such orders allow contact regarding legal matters. (Rudeen Aff., Ex. H). The fact that Plaintiff can contact said parties regarding legal matters is shown by the fact that Plaintiff sued Martha Lee after the no-contact order issued. Hodson v. Hodgson, et al., Civ. No. 00-2102 (Dist. Minn. Sept. 11, 2000).

Finally, assuming that this might be a backward looking claim, Plaintiff has neither requested a remedy for the underlying claim nor shown that such remedy is not otherwise available. Therefore, for all the above reasons, this aspect of Plaintiff's Count Five should fail as a matter of law.

### C. Discussion: Due Process

The very most procedural due process Plaintiff may be entitled to receive is (1) to receive notice of the no-contact order; (2) to have a opportunity to protest the order by filing a grievance; and (3) to have a person other than the one who issued the order review the grievance. Defendants have provided Plaintiff with notice of the orders (Rudeen Aff., Ex. F and G) and made a grievance procedure available to Plaintiff. See generally supra Part V (discussing Minnesota DOC Policy 303.100 providing for offender/staff communication and the filing of grievances). In connection with these no-contact orders, Plaintiff apparently has not taken advantage of such procedures, and Plaintiff's request for a full-blown hearing is clearly not required and merits no further discussion. Finally, Defendants need not "enable the prisoner to *discover* grievances." Lewis v. Casey, 518 U.S. 343, 354 (1996). Therefore, this aspect of Plaintiff's Count Five should fail as a matter of law.

Based upon the foregoing and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1. Plaintiff's Motion for Summary Judgment on Counts One and Three of the Complaint (Doc. No. 14) should be **DENIED**.

2. Defendant's Motion for Summary Judgment (Doc. No. 44) should be **GRANTED**.

3. Plaintiff's Complaint should be **DISMISSED WITH PREJUDICE**.

Dated: December 24, 2002

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by January 7, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wising to oppose such objections must file and serve all parties with its response. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.